## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| ETTA JALLOH, | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 07-63** |
| v. | ) | **RMC** |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| Defendant. | ) | |

_____

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Etta Jalloh hereby respectfully moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment. In support of her Motion, Ms. Jalloh submits the attached Memorandum and states as follows:

1)      The administrative hearing officer erred in denying the Plaintiff any relief for the failure of the District of Columbia Public Schools ("DCPS") to serve a response to the administrative complaint.

2)      The hearing officer erred in denying the Plaintiff any relief for DCPS' failure to produce requested school records.

3)      The hearing officer erred in admitting and eliciting hearsay testimony in violation of the Plaintiff's right to confront and cross-examine witnesses.

4)      DCPS failed to perform necessary evaluations of R.H., failed to provide necessary instruction and services to R.H., and failed to provide R.H. with an appropriate school placement.

5)      Rock Creek Academy is an appropriate school placement for R.H..

For these reasons and the reasons stated in the attached Memorandum, the Plaintiff respectfully requests that this Court grant her summary judgment on all claims and issue the proposed order attached hereto.

Respectfully submitted,

/s/_____
Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave. NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

—————————————————————

|                                    |     |                          |
|------------------------------------|-----|--------------------------|
| ETTA JALLOH,                       | )   |                          |
|                        Plaintiff,  | )   |                          |
|                                    | )   |                          |
|                                    | )   | **Civil Action No. 07-63** |
| v.                                 | )   | **RMC**                  |
|                                    | )   |                          |
| DISTRICT OF COLUMBIA,              | )   |                          |
|                       Defendant.   | )   |                          |

—————————————————————

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The Plaintiff, Etta Jalloh, brought this case on behalf of her son under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., to challenge an administrative decision that granted her partial relief from the District of Columbia School ("DCPS"). The Plaintiff seeks funding for a private school placement and declaratory and injunctive relief related to compensatory education.

This memorandum is primarily devoted to procedural issues, because DCPS' procedural violations made it nearly impossible for either party to present meaningful evidence at the due process hearing. Those procedural violations include the failure to produce school records after multiple requests and the failure to serve a response to the administrative complaint. Though the Plaintiff asks the court to rule in her favor solely on the basis of DCPS' egregious procedural violations, the Plaintiff's case for placement on the merits is overwhelming.

1

## BACKGROUND

Ms. Jalloh's son R.H. is a twelve-year-old boy whom DCPS has classified as emotionally disturbed and in need of a full-time, therapeutic school placement. (R. at 58-59.) On June 16, 2004, at the end of the 2003-2004 school year, DCPS changed R.H.'s school placement from the Center for Life Enrichment, where he had been placed by administrative order, to the Hamilton Center ("Hamilton"). Amended Answer at ¶ 7-8.

Upon placing R.H. at Hamilton, DCPS issued a "Prior to Action Notice," also known as a "prior written notice" or a "prior notice," regarding the placement. (R. at 52.) In the section of the notice titled "Description and Explanation of agency action proposed or refused," DCPS stated only, "DCPS feels that Hamilton Center is an appropriate placement that can meet [R.H.'s] needs." (R. at 52.) In the section titled "Description of Other Options Considered and reasons for rejection of each option," DCPS stated only, "Parent and Advocate disagree and have proposed Episcopal, High Road and Rock Creek. When DCPS has an appropriate program it gives first priority to that prog." Id. The prior notice contains no description of evaluation procedures, assessments, records, and/or reports that DCPS used as a basis for its decision to place R.H. at Hamilton.

DCPS did not finalize R.H.'s individualized education program ("IEP") at the June 2004 meeting. Instead, DCPS committed to performing a psychoeducational evaluation and a speech/language evaluation and reconvening in 30-60 days to develop the IEP. (R. at 42, 50.) DCPS performed the psychoeducational evaluation in January 2005, but never performed the speech/language evaluation, and did not reconvene the IEP meeting until July 19, 2006. See Amended Answer, Exhibit 3; (R. at 58.)

2

Over the next two years, as R.H. attended Hamilton, Ms. Jalloh concluded that he was not progressing academically. (R. at 250-251.) For that reason, and because at the July 2006 meeting Hamilton could not produce any evaluations or any records of instruction, services, or progress at Hamilton over the two years, at that meeting Ms. Jalloh and her advocate,[1] Sharon Millis, requested a change in placement for R.H.. Amended Answer at ¶ 15; (R. at 61-65.) Without any discussion on the subject, DCPS refused to change the school placement, but did not issue a prior notice regarding that refusal.

DCPS developed an IEP for R.H. at the July 2006 meeting, but Ms. Jalloh did not approve the IEP because there was inadequate documentation of R.H.'s abilities and his progress to enable the development of the IEP. (R. at 64-65.) At the end of the meeting, DCPS again committed to performing a psychoeducational evaluation, and to reconvening to review that evaluation. (R. at 63.)

On July 31, 2006, the Plaintiff filed a due process complaint alleging failures "to conduct and review evaluations…to develop adequate IEPs…to provide necessary special education and related services [and] to provide an appropriate placement." (R. at 111.)   Prior to the filing of the complaint, DCPS had not given Ms. Jalloh a prior written notice regarding her claims of DCPS' failures to perform evaluations, to develop appropriate IEPs, to provide instruction and services, and to change R.H.'s placement when requested in July 2006. The only prior notice that Ms. Jalloh had received was the June 16, 2004 document regarding the initial placement.

---

[1] While the courts often use the term "advocate" to refer to a court-appointed special education attorney, outside of court the term usually refers, as it does in this case, to a non-attorney specialist in assisting parents with special education processes and services.

On August 16, 2006, DCPS served on Plaintiff's counsel a document intended as a response to the due process complaint. (R. at 116-117.) In the first numbered paragraph of the Response, DCPS "denie[d] the allegation it failed to complete a speech and language evaluatin [sic] and a psycho-educational evaluation," but appeared to base this denial on the grounds that the evaluations were not necessary. (R. at 116.) In the second numbered paragraph, DCPS "denie[d] the allegation the Hamilton Center is not reasonably calculated to provide a Free and Appropriate Education to this student." Id.

The Response contains no statement regarding the Plaintiff's claim that DCPS had failed to develop appropriate IEPs and had failed to provide necessary instruction and services. Id. The Response contains no explanation of DCPS' decisions to place R.H. at Hamilton in 2004 and to refuse to change his placement in 2006. The Response contains no explanation of DCPS' decision not to perform a speech/language evaluation and the basis of that decision other than the statements: "Recommendations are not mandates for the MDT team to follow. Two years have elapsed since June 16, 2004 and DCPS has no record of the parent requesting either of these evaluations." Id.

While the complaint process was in progress, the IEP team reconvened on August 31, 2006, with Ms. Millis in person and Ms. Jalloh available by phone. (R. at 66.) Instead of reviewing a new psychoeducational evaluation, DCPS reported for the first time that a psychoeducational evaluation had been done in January 2005. (R. at 66.) DCPS then ordered more evaluations, and planned to reconvene afterwards. (R. at 67.)

Twice in person and once in writing, Ms. Jalloh's representatives requested from DCPS evaluation reports, records of R.H.'s receipt of instruction and services at Hamilton, and records of his progress during his time there.

At the July 19, 2006 meeting, Ms. Millis requested all records. In her notes, which were provided to DCPS at the end of the meeting, Ms. Millis recorded that "[p]rogress reports and portfolio information…that the Advocate requested were not available," and complained that there was "[n]o documentation of progress or current academic levels," and that the "[c]linician states he is making progress but there are no documents to support this." (R. at 64-65.)

Charles Ugoji, Hamilton's Special Education Coordinator, who took DCPS' notes of that meeting, apparently found Ms. Millis' repeated requests for records bothersome. He complained that "Ms. Millis' requests were becoming monotonous," and that she began the meeting with "much haggling and nagging on why the teacher was not present and report card, progress reports." (R. at 62.) He noted that later in the meeting Ms. Millis had "requested for [sic] progress notes from the clinician but we were unable to produce the notes[.]" (R. at 62.)

Ms. Millis' complaints of DCPS' failure to produce records continued at the August 31, 2006 meeting, at which she noted that "the teacher who is no longer at the school did not leave any documentation supporting progress[.]" (R. at 68.)

After the filing of the due process complaint, Plaintiff's counsel sent a written records request to Mr. Ugoji, which included requests for all evaluations, report cards, progress reports, and encounter tracking forms. (R. at 119.) Mr. Ugoji did not respond to that request. (R. at 5, 9, 257-260.)

A hearing was convened on September 29, 2006.

At the hearing, the Plaintiff moved for a default judgment based on DCPS' failure to serve a response in compliance with 20 U.S.C. § 1415(c)(2)(B)(i)(I), specifically the

failure to address the claims regarding the IEPs and the provision of instruction and services at all, and the failure to provide any of the required information regarding the remaining claims. (R. at 160-165, 242-48.) The hearing officer denied the motion on the basis of his finding that the response was sufficient. (R. at 8, 171, 173.) The hearing officer similarly "concluded that DCPS was not strictly limited to assertions made in its response in presenting its defense to any alleged violations and/or denials of FAPE." (R. at 8.)

After the hearing officer denied the motion for default, the Plaintiff requested, based on DCPS' failure to produce records of instruction, services, and progress at Hamilton in response to the Plaintiff's requests, an inference that Hamilton had not been providing R.H. adequate education and services, and could not do so going forward. (R. at 189-96, 212-13.) The hearing officer's ruling on that motion at the hearing was not at all clear. (See R. at 193-96, 212-14.) In the HOD the hearing officer stated that he had "indicated during the hearing that an inference would be drawn from the absence of the DCPS witnesses and from DCPS not providing the student's records, [but had] clearly indicated the inference without additional evidence, would not be dispositive of the alleged claims of denial of FAPE."[2] In the HOD, the hearing officer went on to rule that, because the Plaintiff had not gone to Hamilton to copy records since the filing of the complaint, he "could not conclude, based solely on the absence of records…that DCPS denied the student FAPE." (R. at 9.)

---

[2] As noted below, the hearing officer repeatedly referred to claims from the Plaintiff regarding the absence of compelled witnesses, and criticized the Plaintiff's alleged position on that issue, but at the hearing, Plaintiff's counsel had mentioned the compelling of a witness only once, and with little argument. (R. at 224.)

The hearing officer entered twenty-one documents into evidence for the Plaintiff, and five documents for DCPS. (R. at 18-143.) Three witnesses testified for the Plaintiff: Ms. Jalloh testified that R.H.'s math and reading skills had not improved during his time at Hamilton; Keith Coyle, a member of Plaintiff's counsel's firm, testified that DCPS had not responded to the records request; Kendra Hill, from Rock Creek Academy, testified regarding that private school's ability to educate R.H.. (R. at 249-55, 255-60, 260-66, respectively.)

Mr. Ugoji was the only witness to testify for DCPS. Relevant to the Plaintiff's claims in this case, Mr. Ugoji testified that R.H. "is…receiving his counseling services at the Hamilton Center." (R. at 224.) Mr. Ugoji did not state for how long R.H. had been receiving his counseling, and with what consistency. See id. Mr. Ugoji did not testify that R.H. had received specialized instruction. See id. Mr. Ugoji did not testify that R.H. had made any progress while at Hamilton.

The hearing officer issued his HOD on October 13, 2006. (R. at 2-16.) He ruled for the Plaintiff on the claim of failure to develop appropriate IEPs, and ruled for DCPS on the three other claims – failure to perform evaluations, failure to provide instruction and services, and failure to provide an appropriate placement. (R. at 10-12.)

The hearing officer found no evidence on either side regarding whether DCPS had performed a speech/language evaluation, and ruled against the Plaintiff because "it was not DCPS' burden to prove the evaluation was conducted. It was the parent's burden to prove that it was not." (R. at 10.)

The hearing officer found for DCPS regarding the provision of instruction and services because "Mr. Ugoji credibly testified the student has been provided services

under the existing IEP since he attended Hamilton." (R. at 11-12.) Similarly, he found for DCPS regarding the appropriateness of Hamilton for R.H. because "Mr. Ugoji credibly testified the student received the services under that IEP since he attended Hamilton." (R. at 11.)

At places in the HOD, the hearing officer appears to have confused this case with another. The HOD contains several paragraphs regarding a motion from the Plaintiff for an adverse inference based on DCPS' failure to produce compelled witnesses and an ensuing discussion. (R. at 8-9.) The transcript contains no such motion and discussion.

The Plaintiff timely filed her complaint challenging the HOD.

## STATUTORY FRAMEWORK

The IDEA, 20 U.S.C. § 1400, et seq., guarantees "that all children with disabilities have available to them free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.300.

"The primary vehicle for implementing these congressional goals is the "individualized educational program (IEP)…Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988).

Students' abilities must be assessed and evaluated before they can be found eligible to receive specialized instruction. See 20 U.S.C. § 1414(b)(4). "Each local

educational agency shall ensure that...the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B).

To protect the rights of parents of a child with a disability, the IDEA requires the local educational agency to provide written prior notice whenever the agency "proposes to initiate or change, or refuses to initiate or change the identification, evaluation, or educational placement of the child, or the provision of free appropriate public education to the child." 20 U.S.C. § 1415(b)(3).

Furthermore, the IDEA guarantees parents of a child with a disability the right to examine all records relating to that child. See 20 U.S.C. § 1415(b)(1). The local educational agency "must comply with a request [for records] without unnecessary delay…and in no case more than 45 days after the request has been made." 34 C.F.R. § 300.613(a).

Congress has also afforded parents several procedural safeguards. See 20 U.S.C. § 1415. Among them are the right to an administrative "due process hearing," and the right of "any party aggrieved by the findings and decision" at a due process hearing "to bring a civil action with respect to the complaint presented...in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In such a proceeding, the focus of a reviewing court's inquiry is two-fold:  (1) whether the state has complied with the procedural requirements of the Act; and (2) whether the IEP developed through these procedures is "reasonably calculated to enable the child to receive educational benefits." Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-207 (1982).

Amendments to the IDEA effective July 2005 established new pleading standards. The IDEA now requires greater specificity in due process complaints, allows a respondent to challenge the sufficiency of a complaint, and requires that a respondent serve a "response" to the complaint containing certain specific information. See 20 U.S.C. §§ 1415(b)(7) and 1415(c)(2).

The IDEA also sets forth evidentiary procedures for due process hearings. At least five days before a due process hearing, "each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing." 20 U.S.C. § 1415(f)(2)(A). Every party to a hearing has the absolute right to "[p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at five business days before the hearing[.]" 34 C.F.R. § 300.512(a)(3). Each party also has the right to confront, cross-examine, and compel the attendance of witnesses. See 20 U.S.C. § 1415(h)(2).

## SUMMARY JUDGMENT STANDARD

In general, summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, a trial court must draw all justifiable inferences in the non-moving party's favor, but the non-moving party may not rely on mere conclusory allegations, and "must present significant probative evidence tending to support" its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In a summary judgment motion, "the burden on the moving party may be

discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Unlike typical judicial review of administrative action, in suits filed under the IDEA following an administrative hearing, the court bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). "The district court's standard of review under the IDEA is less deferential than that applied under the traditional substantial evidence test used in ordinary administrative review cases." Scorah v. District of Columbia, 322 F. Supp. 12, 16 (D.D.C. 2004) (citing Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988) and Kroot v. D.C., 800 F. Supp. 976, 981 (D.C.C. 1992)). Still, the Plaintiff must persuade the court that the hearing officer was wrong, and the court must explain its basis for ruling against the hearing officer. See Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988).

## ARGUMENT

## I.     THE HEARING OFFICER ERRED IN DENYING THE PLAINTIFF RELIEF FOR DCPS' FAILURE TO SERVE AN ADEQUATE RESPONSE

DCPS' Response to the Plaintiff's due process complaint plainly fails to meet the explicit requirements of the IDEA. The United States District Court for the District of Columbia has ruled that DCPS must follow the IDEA response requirements to the letter of the law. See Massey v. District of Columbia, 400 F. Supp. 2d 66, 71 (2005) ("This court has not been directed to any evidence that Congress intended an exemption for 'close enough.'") Because DCPS has blatantly disregarded those requirements, DCPS has failed to file any response in accordance with 20 U.S.C. § 1415(2)(B)(i)(I).

11

The IDEA does not specify the remedy for a failure to serve a response, but the United States Court of Appeals for the District of Columbia Circuit has ruled that where the IDEA is silent regarding a procedural rule, the most closely analogous state rule must be applied. See Spiegler v. Dist. of Columbia, 866 F.2d 461 (D.C. Cir. 1989)(applying local limitations period for appeals of administrative decision to federal actions brought following adverse administrative decisions under predecessor to IDEA). The state rules most closely analogous to this situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a), which provide the remedy for a civil defendant's failure timely to file an answer to a complaint. Because those rules require that a court enter a default in the event that a defendant fails timely to file an answer, the hearing officer should have granted the Plaintiff a default for DCPS' failure to serve a response.

Having denied the Plaintiff a default judgment, the hearing officer should still have taken steps to ensure that the Plaintiff was not prejudiced by DCPS' failure to serve a response. Specifically, the hearing officer should have held that DCPS had waived any defenses not stated in its Response, and should have limited argument and evidence accordingly.

### A.     DCPS Failed to Serve a Response as Required by the IDEA.

The IDEA makes perfectly clear the requirement of a response to a due process complaint, and this court has enforced that requirement. The hearing officer denied the Plaintiff's motion for default because he found that DCPS' Response was adequate under the law, but there is no reasonable argument that the Response fulfilled the legal requirements.

1.    A response was required.

The IDEA requires that:

[i]f the local educational agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include –
(aa) an explanation of why the agency proposed or refused to take the action raised in the complaint;
(bb) a description of other options that the IEP Team considered and the reasons why those options were rejected;
(cc) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and
(dd) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(2)(B)(i)(I).

As noted above, the due process complaint contained four claims, that DCPS had failed "to conduct and review evaluations…to develop adequate IEPs…to provide necessary special education and related services [and] to provide an appropriate placement." (R. at 111.)

Prior to the filing of the complaint, DCPS had not given Ms. Jalloh a prior written notice conforming to IDEA requirements and regarding the subjects of the complaint such that it would be excused from the response requirement. The one prior notice issued, on June 16, 2004, regarded only the initial placement of R.H. at Hamilton in 2004, and not the failures to perform evaluations, to develop appropriate IEPs, to provide instruction and services, and to change R.H.'s placement when requested in 2006. (R. at 52.)

Moreover, as it relates to the initial placement in 2004, the June 16, 2004 notice plainly fails to provide all of the information required in a prior notice under 20 U.S.C. § 1415(c)(1), including:

- "an explanation of why the agency proposes or refuses to take the action" (other than the statement that "DCPS feels that Hamilton is an appropriate placement that can meet [R.H.'s] needs.");

- "a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;"

- "a description of other options considered by the IEP Team and the reason why those options were rejected" (other than "When DCPS has an appropriate program it gives first priority to that prog."); and

- "a description of the factors that are relevant to the agency's proposal or refusal."

It is telling that, in arguing against the motion for default, DCPS never contended that they had sent a prior notice complying with 20 U.S.C. § 1415(c)(1), and in deciding the motion, the hearing officer did not find that a prior notice had been sent. (R. at 8, 165-167.)

Because DCPS had no issued a prior notice in compliance with 20 U.S.C. § 1415(c)(1) regarding the subject matter contained in the parent's due process complaint, DCPS was required to serve a response.

2.    <u>DCPS' Response did not meet the requirements of 20 U.S.C. § 1415(c)(2)(B)(i)(I).</u>

In the absence of a prior notice, DCPS served a document intended as a response, but the Response does not remotely comply with the IDEA. (R. at 116-17.) The Response contains no mention at all of two of the Plaintiff's four claims, that DCPS had failed to develop appropriate IEPs and had failed to provide necessary instruction and services. (R. at 116-17.) Though the Response contains a summary denial of each of the two other

claims, it does not contain any of the information required by 20 U.S.C. §
1415(c)(2)(B)(i)(I).

Regarding the claim that DCPS had failed to provide an appropriate placement for
R.H., the Response did not include:

- "an explanation of why" DCPS placed R.H. at Hamilton in 2004 and refused to
  move him in 2006;

- "a description of other options that the IEP Team considered and the reasons why
  those options were rejected;"

- "a description of each evaluation procedure, assessment, record, or report" upon
  which DCPS based its decision to place R.H. at Hamilton in 2004 and its refusal
  to move him in 2006; or

- "a description of the factors that are relevant" to DCPS' initial placement decision
  and its later refusal to move R.H..

Instead of providing any of that information, DCPS simply stated a legal standard and
denied that it had been violated.

The Response lacks all of the same required information regarding the evaluation
claim. There is no explanation of the failure to perform the evaluations, description of
other options considered, or identification of records and evaluations relevant to the
failure to evaluate. DCPS failed even to state that it had performed the psychoeducational
evaluation, which has since been established. See Amended Answer, Exhibit 4. Instead of
providing that information, DCPS cryptically stated, in response to the Plaintiff's claim
that the MDT had recommended the evaluations, that "[r]ecommendations are not
mandates for the MDT team to follow." (R. at 116.)

15

This court directly addressed the IDEA's response requirement in <u>Massey</u>:

> Under the statute, if DCPS had not previously issued a Prior Notice…, it was required to respond in writing to the request for a due process hearing. Furthermore, DCPS may not determine the form of its response:  the required content of the written response is precisely detailed in the IDEA….[T]he IDEA does not allow DCPS to respond generally to the substance of the complaint in whatever form it deems appropriate.
> ***
> Congress' delineation of the four requirements makes clear that general responses are not acceptable.

400 F. Supp. 2d at 71 (citations omitted).

The court then dismissed DCPS' argument that "any failure to conform to the statute was a mere technical oversight." <u>Id</u>. at 72. To the contrary, the court emphasized:

> It is technical compliance with the law...that gives parents faith that their concerns will be addressed in accord with Congress' intent. Many of the procedural safeguards in the IDEA are extremely technical, spelling out particular deadlines and required content. This kind of detail embodies the purpose of a statute prescribing administrative – i.e., procedural – remedies. . . Does DCPS mean to imply that it is permitted to violate the IDEA as long as the ways in which it does so are minor? This Court has not been directed to any evidence that Congress intended an exemption for "close enough."

<u>Id</u>. (citations omitted).

As in <u>Massey</u>, DCPS here provided none of the information required in a response with regards to DCPS' initial placement of R.H. at Hamilton in 2004, its refusal to change the placement in 2006, and its failure to perform a speech/language evaluation. Regarding the other claims, DCPS failed even to mention its failures to develop appropriate IEPs and to provide prescribed specialized instruction and related services. DCPS has therefore failed to serve a response as required by the IDEA.

16

**B.      The Hearing Officer Should Have Granted a Default or Similar Relief.**

In <u>Massey</u>, the court stated that Congress intended there to be a remedy for DCPS' failure to serve a response. <u>See</u> 400 F. Supp. 2d at 73 ("Surely, Congress did not intend for parents to be left with no remedy when the school district fails to observe the procedural safeguards in the IDEA."). Unfortunately, the IDEA is silent on the question of the proper remedy for the failure of a local educational agency ("LEA") to file a response under 20 U.S.C. § 1415(2)(B)(i)(I).

The federal courts have held that, where the IDEA is silent regarding a procedural rule, the most closely analogous state rule must be applied. In an administrative proceeding under the IDEA, the most closely analogous state rules are the District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a), which provide the remedy for a civil defendant's failure timely to file an answer to a complaint.

Because those rules require that a court enter a default when a defendant fails timely to file an answer, the hearing officer should grant the Petitioner a default for DCPS' failure to serve a response.

1.      <u>In the absence of a clear procedure in the IDEA, the most closely analogous state rules should be applied.</u>

The federal courts have ruled that where the IDEA is silent, the most closely analogous state rule should be applied, provided that the state rule is consistent with the policies of the IDEA. <u>See</u>, <u>e.g.</u>, <u>Spiegler</u>, 866 F.2d 461.

In <u>Spiegler</u>, the Court of Appeals held that the District of Columbia's 30-day statute of limitations for review of agency orders applied to federal cases challenging

hearing officers' decisions under the Education of the Handicapped Act ("EHA"), the predecessor to the IDEA. 866 F.2d at 462-470. Congress had not provided a statute of limitations in the text of the EHA, so the Court of Appeals applied the local limitations period because it was closely analogous and consistent with the policies underlying the EHA. <u>Id</u>.

The Court in <u>Spiegler</u> applied a two-part analysis: 1) identify the most closely analogous state rule; and 2) determine whether the application of that rule was consistent with the federal policies underlying the EHA. In performing the first part of the analysis, the Court held that a substantive federal claim challenging the findings and decision of an EHA hearing officer was "sufficiently analogous to an appeal from an administrative decision to permit us to borrow the 30-day local limitations period for such appeals." 866 F.2d at 466. In the second part of the analysis, the Court concluded "that a 30-day limitations period, when combined with a duty by the District to inform hearing participants of the short [limitations] period, was not so harsh as to be inconsistent with [the EHA's underlying] policies." <u>Id</u>.

Though the <u>Spiegler</u> Plaintiffs had argued for the application of the District of Columbia's default 3-year statute of limitations, the Court of Appeals found the 30-day limitations period consistent with federal policies: "Because the Act emphasizes the prompt resolution of disputes, we find at the outset that a shorter rather than longer statute of limitations would be more consistent with the policies underlying the Act." <u>Id</u>. at 467.

In keeping with <u>Spiegler</u>, in forming a remedy for DCPS' failure to serve a response to the complaint, the court should determine the state rules most closely

analogous to this situation, and should apply them if they are not inconsistent with the federal policies underlying the IDEA.

2.     The state rules most closely analogous to this situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a).

Generally, the two best sources for analogous rules in IDEA hearings are the District of Columbia Office of Administrative Hearings Procedural Rules ("OAH rules"), D.C. Mun. Regs. tit. 1 §§ 2800 et seq., and the District of Columbia Superior Court Rules of Civil Procedure ("Civil Rules").

In Spiegler, the Court of Appeals used the OAH Rules to determine the appropriate statute of limitations period for challenging the findings and decisions of an impartial due process hearing officer. However, because the OAH Rules do not require any response in a state administrative proceeding, they are not applicable to an action initiated under the IDEA, which now requires a response containing very specific information within 10 days of the filing of the complaint. Compare D.C. Mun. Regs. tit. 1 §§ 2813.5 ("[u]nless otherwise ordered, no responsive pleading is required in cases commenced by a request for a hearing.") with 20 U.S.C. § 1415(2)(B)(i)(I) (requiring responses to IDEA complaints and listing necessary elements in a response).

The Civil Rules, on the other hand, deal extensively with every aspect of pleading practice, including the procedures for serving initial and responsive pleadings and the consequences of violations of those procedures. See D.C. Super. Ct. Civ. R. 3, 7, 8, 12 & 55. The Civil Rules dictate the necessary contents of answers, the timelines for filing answers, and the penalties for failure to file. See D.C. Super. Ct. Civ. R. 12 & 55.

19

Because the OAH rules do not require responsive pleadings and the Civil Rules do, the Civil Rules contain the rules most closely analogous to the IDEA response requirement. The court should therefore apply the Civil Rules by analogy as long as they are consistent with the federal policies underlying the IDEA.

        3.      By analogy, the Civil Rules required the hearing officer to rule by default for the Plaintiff.

District of Columbia Superior Court Rule of Civil Procedure 12(a)(5) and 55(a) are the state rules most closely analogous to DCPS' failure to serve a response, as argued supra. The rules require that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the Clerk or the Court shall enter the party's default." D.C. Super. Ct. Civ. R. 55(a); see also D.C. Super. Ct. Civ. R.12(a)(5) ("Except where the time to respond to the complaint has been extended as provided in Rule 55(a), failure to comply with the requirements of this Rule shall result in the entry of a default by the Clerk or the Court sua sponte unless otherwise ordered by the Court.")

The courts do not have any discretion in the entry of a default for failure to respond to a complaint; "the Clerk or the Court shall enter the party's default." D.C. Super. Ct. Civ. R. 55(a). The comment to Rule 12 makes clear the intent that default be automatic in those circumstances. See D.C. Super. Ct. Civ. R. 12, cmt ("[P]aragraph (5) has been added to preserve the existing Superior Court rule of automatic entry of default against a defendant who does not timely respond to the complaint.").

The District of Columbia Court of Appeals has addressed this issue, and has enforced the clear text of the Rules in favor of automatic and non-discretionary default. See Digital Broadcast Corp. v. Rosenman & Colin, LLP, 847 A.2d 384, 388-89 (D.C.

App. 2004) (holding that Rule 55(a) default is automatic and non-discretionary); Restaurant Equip. and Supply Depot, Inc. v. Gutierrez, 852 A.2d 951, 954-56 (D.C. App. 2004) (holding that default for failure to file answer was automatic even where defendant had filed motion to dismiss).

An entry of default is not a final judgment terminating a proceeding. "[T]he entry of default does not constitute a judgment, but simply precludes the defaulting party from offering any further defense on the issue of liability." Lockhart v. Cade, 728 A.2d 65, 68 (D.C. 1999). "[T]he defaulted party retains the right to contest and mitigate unliquidated damages." Digital, 847 A.2d at 389 n.7. In other words, the default resolves all liability questions against the defaulting party, but does not determine ultimate relief.

Because the serving of a "response" under the IDEA is a perfect analogue to the filing of an answer under the Civil Rules, and DCPS has in this case failed to serve a response, by analogy to the Civil Rules the hearing officer should have issued the equivalent to a default against DCPS. The equivalent to a default in IDEA administrative hearings is a finding, as a matter of law, that DCPS has committed all of the violations identified in the Complaint. From that finding, the hearing could then proceed, if necessary, on the question of remedy.

4. An order of default after DCPS has failed to serve a response is wholly consistent with the policies underlying the IDEA in that it protects the rights of children, encourages prompt resolution of disputes, promotes administrative efficiency and preserves procedural equity.

The application of the Civil Rules to this situation and the consequential order of default against DCPS comports with the policies underlying the IDEA.

The primary purposes of the IDEA are "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1).

Additionally, it is clear from the statute and the caselaw that certain policies underlie the procedural aspects of the IDEA. In Spiegler, the Court of Appeals noted that Congress' intent in passing the EHA was "to ensure the prompt resolution of disputes regarding the appropriate education for handicapped children." 866 F.2d 461, 467. The amendments to the IDEA effective in 2005, most notably the clauses regarding the complaint, the response and the resolution session, indicate a Congressional intent to improve administrative efficiency by narrowing issues and limiting unnecessary hearings. See 20 U.S.C. § 1415(b)(6), (c)(2)(B)(i)(I) & (f)(1)(B). Finally, Congress' respect for the adversarial process and intent to establish basic procedures to ensure fairness in hearings can be found in the IDEA's right to counsel, right to disclosure of evidence, right to subpoena, right to cross-examination, right to attorneys' fees, the new clauses enabling the dismissal of inadequately drafted complaints, and the new provisions regarding the training and competence of hearing officers. See 20 U.S.C. § 1415(c)(2)(A), (f)(3)(A) & (h).

These four purposes – protection of the rights of children with disabilities, prompt resolution of special education disputes, administrative efficiency and procedural fairness – are all furthered by an order of default against DCPS for failing to serve a response.

Obviously, a ruling in favor of a parent or child, particularly a ruling that prevents the LEA from violating the IDEA and sandbagging a petitioner at hearing, helps to

protect the rights of children with disabilities. It is equally obvious that a default for failure to respond to a complaint furthers prompt resolution and administrative efficiency, both in the short term, in that the parties and the hearing officer are not forced to litigate issues regarding which DCPS has offered no defense, and in the long term, in that DCPS will be more likely to serve a proper response in future cases.

The impact of a default on procedural equity deserves a bit more consideration, because the recent amendments to the IDEA have changed the balance of procedural obligations. Under the old version of the law, a petitioner needed only to file a minimal hearing request, and DCPS did not need to file a response. Under the current version of the law, by the time DCPS has failed to serve a response and thereby made itself subject to default, a petitioner has had to file a substantially more comprehensive complaint, which has had to withstand a judgment of its sufficiency. See 20 U.S.C. § 1415(b)(7) & (c)(2)(D). If the complaint is found sufficient, the petitioner is granted a hearing, but cannot raise any issue not identified in the complaint. See 20 U.S.C. § 1415(f)(3)(B). While petitioners now bear that new burden, DCPS bears a new burden of its own – the response to the complaint.

A default against an LEA for failure to serve a response would enforce the policy of procedural fairness evident in the IDEA's new requirements of a reciprocal information exchange prior to the resolution session and the hearing. To decline to issue a default would confound Congress' clear intent to require LEAs to provide the same level of information that petitioners must provide, and would create a fundamentally unfair system in which a petitioner is denied his/her opportunity to make a case if he/she fails to

provide information according to IDEA procedure, but an LEA is allowed to make its case in the opposite situation.

Finally, a default for a failure to serve a response is often vital to the preservation of procedural equity, now that the burden of proof in IDEA hearings is on the complaining party. Prior to the Supreme Court's decision in <u>Schaffer v. Weast</u>, the burden of proof in IDEA hearings in the District of Columbia rested on the LEA, regardless of who brought the complaint. 546 U.S. 49 (2005). Shortly after the Court in <u>Schaffer</u> established the default rule that the complaining party bears the burden of proof in IDEA hearings, the District of Columbia modified its regulations to place the burden on the petitioner. <u>See</u> D.C. Mun. Regs. tit. 5  3030.3; 546 U.S. 49.

As a result, the petitioner – almost always a parent – is largely dependent upon the Response in the preparation of his or her case. In fact, the Court in <u>Schaffer</u> specifically relied on the response requirement in the IDEA in making its decision, when it rejected "[t]he ordinary rule, based on consideration of fairness, [that] does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary," because the IDEA provides parents with several avenues to information, including the response. 546 U.S. 49, 126 S. Ct. 528, 536-37 (internal quotations and citations omitted).

For all of these reasons, the hearing officer erred when he denied the Plaintiff relief for DCPS' failure to serve an adequate response.

## II.  THE HEARING OFFICER ERRED IN DENYING THE REQUEST FOR INFERENCES BASED ON DCPS' FAILURE TO PROVIDE ACCESS TO SCHOOL RECORDS

As recounted above, Background, Ms. Jalloh's representatives requested records from Hamilton on three different occasions, twice in person and once in writing. (R. at

62-65, 68, 119.) In response, Mr. Ugoji, who found Ms. Millis' "nagging on why the teacher was not present and report card, progress reports," "monotonous," provided nothing other than IEP documentation and the encounter tracking forms for R.H.'s services from October 2002 through April 2005, though R.H. had attended Hamilton from September 2004 through June 2006. (R. at 69-105.)

Needless to say, DCPS' failure to provide records made it impossible for Ms. Jalloh fully to participate in the IEP meetings. Then, at the hearing, DCPS' withholding of the records crippled Ms. Jalloh's ability to make her case, and the hearing officer's ability to make a decision.

In the HOD, the hearing officer placed the responsibility for the absence of documents on the Plaintiff, because the law requires only access to – and not delivery of – records, and "there was no evidence [indicating] that after the complaint was filed the parent or [her representative] actually went to the school…and made effort to copy the records that were available." (R. at 8.) The hearing officer's analysis is flawed in four respects.

First, contrary to the hearing officer's statement, there was evidence of an in-person request after the filing of the complaint. As reviewed in the hearing, Ms. Millis continued her requests for records at the August 31, 2006 meeting, one month after the filing of the complaint. (R. at 68, 170-71, 188-89, 195-96, 210.) She stated that the "[e]ncounter tracking forms need to be printed out" and that the "[c]oncerns about the development of the goals/objectives since the teacher who is no longer at the school did not leave any documentation supporting progress or how goals/objectives were developed which were raised at the last meeting are still an issue." (R. at 68.)

Second, the timing of the in-person requests was irrelevant. None of the relevant provisions of the federal regulations, District of Columbia regulations, and Student Hearing Office Standard Operating Procedures ("SOPs") – all of which the hearing officer quoted in the HOD – specifies that a request for access to records must be made after the filing of a complaint. (See R. at 9, quoting 34 C.F.R. § 300.501, D.C. Mun. Regs. tit. 5 § 3201, and SOPs § 800.2.) For that reason, Ms. Millis' "monotonous" "nagging" at the July 2006 meeting, which the hearing officer failed to mention at all, qualifies as a request for access as well as would any post-complaint request.

Third, the hearing officer ignored the fact that the Plaintiff's written request alone satisfied the SOPs. The SOPs state that "[p]arents should call or write their individual LEA or school(s) to request access to the pupil records." (R. at 9, quoting SOPs § 800.2.) Only an extremely narrow reading of the Plaintiff's written request and the SOPs would find that the Plaintiff had not requested access to the records. Such a narrow reading would be particularly inappropriate in the context of Ms. Millis' repeated in-person requests.

Fourth and finally, the hearing officer failed to account for the undeniable facts that Ms. Millis had requested encounter tracking forms, that DCPS had understood that request and had produced some of the requested forms, and that DCPS had failed to produce any encounter tracking forms for the 2005-2006 school year. In the HOD, the hearing officer found that at the IEP meetings "[t]he advocate also requested encounter tracking forms to reflect the related services provided to the student." (R. at 4.) There is no dispute that DCPS provided encounter tracking forms, but only through April 2005. (R. at 69-105.) There is no dispute that encounter tracking forms are produced to track

the provision of related services, like R.H.'s counseling. (R. at 226.) Given those facts, either DCPS refused access to the encounter tracking forms for the 2005-2006 school year, or there were none, but either way the hearing officer should have inferred that Hamilton had not provided the counseling during the 2005-2006 school year.

For these reasons, the hearing officer's conclusion that the Plaintiff, and not DCPS, was responsible for the absence of records was erroneous. The hearing officer should have held DCPS accountable and made an inference that Hamilton had not been providing R.H. adequate education and services, and could not do so going forward.

## III.    THE HEARING OFFICER ERRED IN ALLOWING AND ELICITING HEARSAY

To the degree that DCPS presented any case, the entirety of it was based on hearsay. The hearing officer found that DCPS had provided R.H. with the instruction and services prescribed in his IEP solely on the basis of Mr. Ugoji's testimony regarding what he had been told by a service provider. (R. at 11-12, 224.) The hearing officer found for DCPS on the placement issue on the basis of that same testimony from Mr. Ugoji, plus testimony that the hearing officer had elicited from Ms. Jalloh regarding the contents of report cards and teacher oral reports. (R. at 11, 252-53.)

The Plaintiff repeatedly objected to hearsay testimony at the hearing, and the hearing officer overruled the objection each time. (R. at 224, 237, 242-48.)

The IDEA does not explicitly prohibit hearsay in hearings, but it does grant each party "the right to…confront, cross-examine, and compel the attendance of witnesses." 20 U.S.C. § 1415(h)(2). That language obviously originates in the Confrontation Clause, which requires that "In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." U.S. Const. amend. VI.

The Confrontation Clause has always been held to "bar[] the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." Idaho v. Wright, 497 U.S. 805, 814 (1990); citing California v. Green, 399 U.S. 149, 155-56 (1970); Bruton v. United States, 391 U.S. 123 (1968); Barber v. Page, 390 U.S. 719 (1968); Pointer v. Texas, 380 U.S. 400, 407 (1965). The IDEA's confrontation clause should accordingly be interpreted to bar the admission of some evidence despite the absence of a specific hearsay prohibition.

Before allowing hearsay under the Confrontation Clause, the courts place two requirements on the hearsay to be admitted: the declarant must be shown to be unavailable, and the declaration must be shown to be reliable. See Wright, 497 U.S. at 814-815. The state bears the burden of proving the unavailability of the declarant. See id. The reliability of the declaration "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66 (1980) (footnote omitted).

There is no reason not to apply this same analysis to situations implicating the IDEA's right to confront and cross-examine. In the case at bar, both instances of hearsay failed to meet the unavailability requirement, and the first instance failed to meet the reliability requirement.

DCPS made no attempt to establish the unavailability of the declarant in Mr. Ugoji's testimony. At the hearing, in response to Plaintiff's counsel's objection that DCPS should produce the declarant, DCPS counsel argued, strangely, that she had "no subpoena power to [e]nsure that people are present physically," but represented that she

had "people available by telephone." (R. at 224-25.) Plaintiff's counsel stated that testimony by telephone was acceptable, but DCPS never produced the declarant or represented that the declarant was unavailable. (R. at 225.) That failure, and the resultant hearsay, are particularly troubling given that the Plaintiff had compelled the declarant's appearance. (R. at 22, 224.)[3]

Regarding the nature of the alleged declaration – that R.H. "is…receiving his psychological counseling," there is no indication of reliability. Such a statement would not fall under any hearsay exception, and there is no other indication of reliability. In fact, given that the documentary evidence shows significant lapses in R.H.'s counseling in the past, a statement that he was receiving his services at that time is very questionable.

The hearsay elicited from Ms. Jalloh regarding teacher comments failed both the unavailability and reliability requirements. The hearsay elicited from Ms. Jalloh regarding the content of the report cards, would fall under the business records exception, so the reliability requirement is met. However, there again is no showing of unavailability. To the contrary, it is hard to understand how the most basic school records, report cards, would be unavailable to DCPS.

Because the hearsay violated Ms. Jalloh's right to confront and cross-examine witnesses, the hearing officer should not have admitted it from Mr. Ugoji and elicited it from Ms. Jalloh.

---

[3] As noted above, the HOD contains a lengthy discussion of procedures for compelling witnesses, in which the hearing officer falsely recounts an exchange between the hearing officer and Plaintiff's counsel. (R. at 8-9.) Though that exchange did not occur in this case, the Plaintiff does contend that she did provide an "other form of notification" acceptable under the SOPs quoted by the hearing officer. (R. at 8, 22.) DCPS apparently agrees, as it used a nearly identical notice to compel Ms. Jalloh's appearance. (R. at 122.)

IV.    **DCPS DID NOT PROVIDE R.H. WITH NECESSARY INSTRUCTION AND SERVICES**

Though the IEPs were challenged (successfully) at the hearing, there is no dispute that R.H. has for years required a full-time, therapeutic school placement that provides him with at least 27.5 hours of specialized instruction and 1.5 hours of counseling per week. (R. at 58-59.)

As discussed above, Argument II, DCPS ignored three requests for the documentation of R.H.'s receipt of instruction in accordance with his IEP during his time at Hamilton. At the hearing, DCPS declined to offer any documentation or testimony of R.H.'s receipt of instruction in accordance with his IEP.

DCPS did produce documentation of the provision of the related service of counseling, but only for the 2004-2005 school year.[4] Unfortunately, as the Plaintiff pointed out at the hearing, that documentation shows that R.H. only received two-thirds of the prescribed hours of counseling in the 2004-2005 school year. Under the 2004 draft IEP or the 2006 IEP, R.H. was to receive 1.5 hours of counseling per week, for a total of 48 hours for the school year. (R. at 31, 58.) Instead, he received only 32.42 hours in the 2004-2005 school year.[5]

In the HOD, the hearing officer ruled against the Plaintiff on this claim because "Mr. Ugoji credibly testified the student has been provided the services under the existing IEP since he attended Hamilton." (R. at 11.) It is unclear whether the hearing officer used the word "services" literally, referring only to the related service of counseling, or generally, referring to all instruction and related services.

---

[4] DCPS also provided prior years' documentation, but those documents were unrelated to Hamilton.
[5] When reviewing the encounter tracking forms, it is important to note that in many cases where there is an entry of minutes, the notes nonetheless indicate that no services were actually provided, due to a scheduling conflict, school closure, or other reason.

If the hearing officer was referring only to the provision of related services, he completely overlooked the question of the provision of specialized instruction in accordance with the IEP. If the hearing officer was referring to specialized instruction as well as the counseling, he was simply wrong. Hearsay issues aside, Mr. Ugoji still said nothing about the provision of specialized instruction at Hamilton. In the exchange in question, DCPS counsel asked whether R.H. was "receiving his psychological counseling." (R. at 224.) Mr. Ugoji said that he was, and went on to say that his knowledge of that was based on his conversations with the counselor. (R. at 224.) There is no question that Mr. Ugoji was speaking only of the counseling.

Regardless, the question and the testimony had no timeframe, so there is no basis for the hearing officer's finding that R.H. had received services "since he attended Hamilton." (R. at 11.) The only question asked was whether he "is" receiving the counseling, not whether he had received all of his counseling since he enrolled in Hamilton. (R. at 224.)

Mr. Ugoji's one hearsay statement, that R.H. "is receiving" his counseling, does not establish that Hamilton had provided and was providing R.H. the instruction and services on his IEP since he enrolled. Because DCPS did not deny in its Response that it had failed to provide the instruction and services, because DCPS did not provide Ms. Jalloh any records of instruction and services other than the limited encounter tracking forms, and because DCPS failed to offer any other evidence of instruction and services provided at hearing, the hearing officer should have ruled on the basis of an inference that R.H. had not received instruction and services in accordance with his IEPs during his two years at Hamilton. See Arguments I and II.

## V.     DCPS FAILED TO PROVIDE R.H. WITH AN APPROPRIATE SCHOOL PLACEMENT

In Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, the Supreme Court identified the method of analysis of special education claims:

> [A] court's inquiry in suits brought under [the IDEA] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. 176, 206-07 (1982). DCPS' initial placement of R.H. at Hamilton in 2004 and its refusal to change the placement in 2006 each fail both prongs of the Rowley test.

### A.     DCPS Failed to Comply with IDEA Procedure When It Placed R.H. at Hamilton and When It Later Refused to Change the Placement.

The IDEA requires that the LEA provide the parent written prior notice whenever the LEA "proposes to initiate or change...or refuses to initiate or change...the identification, evaluation, or educational placement of the child, or the provision of free appropriate public education to the child." 20 U.S.C. § 1415(b)(3).

As argued above, Argument I, when DCPS initially placed R.H. at Hamilton in 2004, though DCPS did issue a document purported to be a prior notice, that document failed to contain the information required by 20 U.S.C. § 1415(c)(1), including:

- "an explanation of why the agency proposes or refuses to take the action" (other than the statement that "DCPS feels that Hamilton is an appropriate placement that can meet [R.H.'s] needs.");

- "a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;"

- "a description of other options considered by the IEP Team and the reason why those options were rejected" (other than "When DCPS has an appropriate program it gives first priority to that prog."); and

- "a description of the factors that are relevant to the agency's proposal or refusal."

(R. at 52.) As noted, neither the hearing officer nor DCPS ever contended that the June 16, 2004 notice constituted a prior written notice under 20 U.S.C. § 1415(c)(1). (R. at 8, 165-167.)

DCPS' procedural violations at the July 2006 meeting, when it refused Ms. Jalloh's request for a new placement, were far worse. DCPS issued no prior notice whatsoever regarding their refusal to change the placement. Compounding the problem, DCPS' failure to produce any evaluations or records at the meeting made it impossible for Ms. Jalloh to participate in any meaningful way, and rendered the entire meeting a pointless sham. (See R. at 61-65.)

> Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA. An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed.

Amanda J. v. Clark County Sch. Dist., 267 F. 3d 877, 892 (9th Cir. 2001) (holding that "by failing to disclose Amanda's full records to her parents once they were requested...the District denied Amanda a FAPE").

## B.     Hamilton Was Not an Appropriate Placement for R.H..

The hearing officer found that Hamilton was an appropriate placement based on two alleged pieces of evidence: 1) Mr. Ugoji's testimony that "the student received the services under [the] IEP since he attended Hamilton;" and 2) Ms. Jalloh's testimony that R.H.'s grades had been good. As noted above, Argument III, all of that testimony was

hearsay that should have been excluded as in violations of the IDEA right to confront and cross-examine. Further, as discussed above, Argument IV, Mr. Ugoji's hearsay testimony regarded only R.H.'s receipt of counseling, not instruction, and did not indicate that R.H. had received the counseling "since he attended Hamilton." Finally, Ms. Jalloh's hearsay statements about grades were irrelevant, because there was no evidence that the grades were tied to actual progress.[6]

      1.      <u>Hamilton did not provide R.H. with necessary instruction and services.</u>

As argued above, Argument IV, this Court should determine that Hamilton did not provide R.H. with the instruction and services he needed. By definition, the Hamilton placement was therefore not "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 206-07.

      2.      <u>R.H.'s academic skills declined during his time at Hamilton.</u>

The evidence indicates that R.H.'s academic skills either remained level or declined during his two years attending Hamilton. At the hearing, Ms. Jalloh, who testified regarding her personal experience helping R.H. with his school work, testified that he was not progressing well, that neither his math skills nor his reading had improved in her estimation. (R. at 250-251, 253.) On the basis of her testimony, the hearing officer found that R.H. "is unable to fill out basic forms and has difficulty in math[.]" (R. at 5.)

Because DCPS had not provided records to Ms. Jalloh, there was no documentation of R.H.'s academic abilities available at the hearing. Now, however, the Defendant has attached to its Amended Answer two psychoeducational evaluations, one from January 2005 and the other from September 2006. R.H. enrolled in Hamilton in

---

[6] While it may seem reasonable to assume that they were, the findings of the formal evaluations, below, expose the grades, if they were good, as meaningless.

September 2004, so those two evaluations together provide a reasonably good picture of the changes in R.H.'s academic skills during his time at Hamilton.

By a comparison of the two evaluations, in those 1.5 school years at Hamilton, R.H.'s grade equivalencies changed as follows:

- Word Reading            1:6 grades improvement[7]
- Reading comprehension    1:1 grades improvement
- Pseudoword Decoding      0:6 grades decline
- Numerical Operations       0:5 grades decline
- Math Reasoning           0:9 grades improvement
- Spelling                   0:3 grades decline

See Amended Answer, Exhibit 3 at 4; Exhibit 4 at 5.

It is important to remember that grade equivalency is an absolute measure; it is not a measure of the child's performance relative to other children. Thus, in that 1.5-year span, R.H. actually regressed in half of the measured academic areas – he was able to answer fewer questions correctly. He improved in the other areas, but only his greatest increase – in word reading – was commensurate with the time elapsed, 1.5 school years. In reading comprehension and math reasoning, while he did not regress, he did lose ground relative to the passage of time.

The standardized scores, which measure R.H.'s skills relative to those of his peers, are perhaps more disturbing:

| | | | |
|---|---|---|---|
| Word Reading | 74 (borderline) | to | 83 (low average) |
| Reading Comprehension | 81 (low average) | to | 79 (low average) |
| Pseudoword Decoding | 79 (borderline) | to | 72 (borderline) |
| Numerical Operations | 107 (average) | to | 80 (low average) |
| Math Reasoning | 84 (low average) | to | 78 (borderline) |
| Spelling | 85 (low average) | to | 72 (borderline) |
| Reading Composite | 79 (borderline) | to | 76 (borderline) |
| Mathematics Composite | 94 (average) | to | 77 (borderline) |
| Written Language Composite | 95 (average) | to | 75 (borderline) |

---

[7] "1:6" refers to 1 year, 6 months.

35

<u>See</u> Amended Answer, Exhibit 3 at 4-5; Exhibit 4 at 3, 5. In short, relative to those of his same-age peers, R.H.'s overall reading skills improved slightly during his time at Hamilton, but his overall math and writing skills dropped precipitously.

For the reasons presented in Argument II, it should be inferred that Hamilton has not provided and will not provide R.H. the instruction and services he needs. Regardless, the hard evidence of the evaluation results and Ms. Jalloh's testimony leave no question that R.H. did not receive educational benefit at Hamilton.

## VI. ROCK CREEK ACADEMY IS AN APPROPRIATE PLACEMENT FOR R.H.

There is no dispute that Rock Creek Academy is an appropriate placement for R.H.. The witness from the school testified at length regarding Rock Creek's ability to educate R.H.. (R. at 261-66.) DCPS apparently did not question Rock Creek's appropriateness, and accordingly declined to cross-examine the witness. (R. at 266.) The hearing officer apparently agreed, and found that:

> Rock Creek can provide the student specialized instruction and related services prescribed by his most recent IEP. [The proposed teacher] processes [sic] the qualifications and applied for provisional certification as a special education teacher. The school has a certified therapist to provide the student counseling services.

(R. at 4.)

Because DCPS has failed to provide R.H. an appropriate placement, the court should order DCPS to fund R.H. at Rock Creek Academy, where he will receive educational benefits.

## VII.   DCPS DID NOT EVALUATE R.H. IN ALL AREAS OF SUSPECTED DISABILITY

There is no dispute that on June 16, 2004, DCPS determined that R.H. needed a speech/language evaluation. (R. at 50.) The Defendant admits that DCPS performed no such evaluation from the filing of the due process complaint to the day of the hearing. Amended Answer at ¶ 29. However, despite the Court's direct order that the Defendant produce such an evaluation or "amend its Answer accordingly," the Defendant continues to refuse to commit, stating in its Amended Answer that it lacks sufficient information to admit or deny that DCPS performed a speech/language evaluation between June 16, 2004 and July 31, 2006. Amended Answer at ¶ 28. At the administrative level, DCPS never denied the Plaintiff's claim that it had not performed the evaluation. (R. at 9, 116.)

There is no legitimate dispute that DCPS failed to perform a speech/language evaluation of R.H. after it determined that one was necessary. Accordingly, the Plaintiff is entitled to summary judgment on her claim that DCPS failed to evaluate R.H. in all areas of suspected disability. See 20 U.S.C. § 1414(b)(3)(B) ("Each local educational agency shall ensure that...the child is assessed in all areas of suspected disability.")

The hearing officer resolved claim of the failure to perform the speech/language evaluation on the basis of the absence of evidence. (R. at 10.) In so doing, the hearing officer unreasonably placed the burden on the Plaintiff to prove a negative.

As addressed above, Argument I, the Supreme Court in Shaffer was willing to place the burden of proof on the petitioner because of the many provisions in the law providing parents access to information. See 546 U.S. 49, 126 S. Ct. at 536-37. In this case, in which DCPS failed to provide a speech and language evaluation in response to multiple requests for records, failed in its Response to deny that it had not done the

evaluation, and failed to disclose such an evaluation at the hearing, it was absurd to place the burden of proving the nonexistence of this document on the Petitioner.

For these reasons, the court should declare that DCPS did not perform the required speech/language evaluation from the time it was prescribed at the June 16, 2004 meeting through the day of the hearing on September 29, 2006.

## CONCLUSION

For the reasons stated above, the court should grant the Plaintiff summary judgment on all of her claims, and order the relief requested in her Motion.


Respectfully submitted,

/s/_____
Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave. NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

# TABLE OF AUTHORITIES

## Cases

<u>Amanda J. v. Clark County Sch. Dist.</u>, 267 F. 3d 877 (9th Cir. 2001) …………………33

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)....................................................10

<u>Barber v. Page</u>, 390 U.S. 719 (1968)……………………………………….…………28

**\*<u>Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v.</u>
<u>Rowley</u>, 458 U.S. 176 (1982)...............................................................................9, 32, 34**

<u>Bruton v. United States</u>, 391 U.S. 123 (1968)………………………………......………28

<u>California v. Green</u>, 399 U.S. 149 (1970)……………………………………………….28

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)…………………………….………......11

<u>Digital Broadcast Corp. v. Rosenman & Colin, LLP</u>, 847 A.2d 384 (D.C. App.
2004).................................................................................................................................20, 21

<u>Honig v. Doe</u>, 484 U.S. 305 (1988)....................................................................................8

<u>Idaho v. Wright</u>, 497 U.S. 805 (1990)…………………………………………………..28

<u>Kerkam v. McKenzie</u>, 862 F.2d 884 (D.C. Cir. 1988)......................................................11

<u>Kroot v. D.C.</u>, 800 F. Supp. 976 (D.C.C. 1992)...............................................................11

<u>Lockhart v. Cade</u>, 728 A.2d 65 (D.C. 1999)……..……………………………………...21

**\*<u>Massey v. District of Columbia</u>, 400 F. Supp. 2d 66 (2005)……………..……11, 16, 17**

<u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980)……………………………………….....……28

<u>Pointer v. Texas</u>, 380 U.S. 400, 407 (1965)………………………………….......…….28

<u>Restaurant Equip. and Supply Depot, Inc. v. Gutierrez</u>, 852 A.2d 951 (D.C. App.
2004).……………………………………………....…………………...........................21

<u>Schaffer v. Weast</u>, 546 U.S. 49 (2005)............................................................................24

<u>Scorah v. District of Columbia</u>, 322 F. Supp. 12 (D.D.C. 2004)………..........………..11

**\*<u>Spiegler v. Dist. of Columbia</u>, 866 F.2d 461 (D.C. Cir. 1989)………........12, 17-19, 22**

## Statutes and Regulations

20 U.S.C. § 1400 <u>et seq</u>.............................................................................................*passim*

34 C.F.R. § 300.300..........................................................................................................8

34 C.F.R. § 300.501..........................................................................................................26

34 C.F.R. § 300.512(a)(3).................................................................................................10

34 C.F.R. § 300.613(a)......................................................................................................9

Fed. R. Civ. P. 56(c)…………………………....……………………………………….10

D.C. Super. Ct. R. Civ. P. 55(a)……………………....……………………12, 17, 19-21

D.C. Super. Ct. R. Civ. P. 12(a)(5)…………………....……………………12, 17, 19-20

D.C. Mun. Regs. tit. 1 §§ 2800 <u>et seq</u>.……………….…………………15, 21, 31

D.C. Mun. Regs. tit. 5 § 3030.3.…………….……...........................………………24

D.C. Mun. Regs. tit. 5 § 3201.…………….…..............................…………………26

U.S. Const. amend. VI.……………………………………………….…………27, 28

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
ETTA JALLOH,                              )
                          Plaintiff,      )
                                          )        **Civil Action No. 07-63**
v.                                        )        **RMC**
                                          )
DISTRICT OF COLUMBIA,                     )
                          Defendant.      )
_____)

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.      DCPS has classified R.H. as emotionally disturbed and in need of a full-time,

therapeutic school placement. (R. at 58-59.)

2.      On June 16, 2004, at the end of the 2003-2004 school year, DCPS convened a

meeting and changed R.H.'s school placement from the Center for Life Enrichment,

where he had been placed by administrative order, to the Hamilton Center ("Hamilton").

Amended Answer at ¶ 7-8.

3.      DCPS developed a draft individualized education program ("IEP") for R.H. at the

June 16, 2004 meeting, but did not finalize the IEP. (R. at 42, 50.)

4.      At the June 16, 2004 meeting, DCPS committed to performing a

psychoeducational evaluation and a speech/language evaluation and reconvening in 30-

60 days to develop the IEP. (R. at 42, 50.)

5.      DCPS performed the psychoeducational evaluation in January 2005. Amended

Answer, Exhibit 3.

6.      DCPS never performed the speech/language evaluation prescribed at the June 16, 2004 meeting.[1]

7.      DCPS did not reconvene the IEP meeting until July 19, 2006. (R. at 58.)

8.      At the July 19, 2006 meeting, Ms. Jalloh requested a change in placement for R.H.. Amended Answer at ¶ 15; (R. at 61-65.)

9.      DCPS refused to change the school placement at the July 19, 2006 meeting. Amended Answer at ¶ 15.

10.     DCPS issued a "Prior to Action Notice" regarding R.H. on June 16, 2004. (R. at 52.)

11.     DCPS did not issue a written prior notice, as that term is used in 20 U.S.C. § 1415, regarding its refusal to change R.H.'s school placement at the July 19, 2006 meeting.[2]

12.     Since June 16, 2004, DCPS has not issued a written prior notice, as that term is used in 20 U.S.C. § 1415, regarding R.H..[3]

13.     On July 31, 2006, Ms. Jalloh filed a due process complaint. (R. at 111.)

14.     On August 16, 2006, DCPS served on Plaintiff's counsel a document intended as a response to the due process complaint. (R. at 116-117.)

15.     The IEP team reconvened on August 31, 2006. (R. at 66.)

16.     Sharon Millis is an "advocate" who regularly assists Ms. Jalloh at IEP meetings. (R. at 31, 42, 61, 66.)

---

[1] At summary judgment, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).
[2] See Footnote 1, supra.
[3] See Footnote 1, supra.

17.    At the July 19, 2006 meeting, Ms. Millis requested to see or to copy R.H.'s school records. (R. at 62, 64-65.)

18.    At the August 31, 2006 meeting, Ms. Millis requested documentation of R.H.'s progress at Hamilton. (R. at 68.)

19.    Charles Ugoji is the special education coordinator at Hamilton. (R. at 17.)

20.    Plaintiff's counsel sent a written records request to Charles Ugoji on September 5, 2006. (R. at 119.)

21.    Mr. Ugoji did not respond to the September 5, 2006 records request. (R. at 5, 9, 257-260.)

22.    Prior to September 30, 2006, in response to the requests for records made by Ms. Millis and Plaintiff's counsel on behalf of Ms. Jalloh, DCPS provided to Ms. Jalloh's representatives a clinical psychological evaluation report, IEPs, meeting notes, an SEP, a Prior to Action Notice dated June 16, 2004, and encounter tracking forms documenting services provided from October 2002 through April 2005. (R. at 23-105.)

23.    Prior to September 30, 2006, in response to the requests for records made by Ms. Millis and Plaintiff's counsel on behalf of Ms. Jalloh, DCPS did not provide to Ms. Jalloh or any representative of hers any documents other than those identified in Statement of Fact #22, above.[4]

24.    A hearing was convened on September 29, 2006. Amended Answer at ¶ 36.

25.    At the hearing, the hearing officer entered twenty-one documents into evidence for the Plaintiff, and five documents for DCPS. (R. at 18-143.)

26.    The hearing officer issued his HOD on October 13, 2006. (R. at 2-16.)

---

[4] See Footnote 1, supra.

3

27.     DCPS through a contractor, performed a psychoeducational evaluation of R.H. in September 2006. Amended Answer, Exhibit 4.

28.     Rock Creek Academy can provide instruction to R.H. in accordance with his most recent IEP, from a certified special education teacher. (R. at 264-265.)

29.     Rock Creek Academy can provide a classroom with a 6-to-one student-to-teacher ratio, with other emotionally disturbed children of comparable age. (R. at 264-65.)

30.     Rock Creek Academy can provide R.H. the counseling prescribed in his IEP. (R. at 265.)

                              Respectfully submitted,

                              /s/_____
                              Douglas Tyrka, #467500
                              Tyrka & Associates, LLC
                              1726 Connecticut Ave. NW, Suite 400
                              Washington, DC  20009
                              (ph) (202) 265-4260
                              (f) (202) 265-4264

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| ETTA JALLOH, | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 07-63** |
| v. | ) | **RMC** |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| Defendant. | ) | |

_____

## ORDER

In consideration of the Plaintiff's Motion for Summary Judgment and any opposition thereto, it is hereby

ORDERED, that the Plaintiff's Motion is granted, and further

DECLARED, that the District of Columbia Public Schools violated the IDEA and denied R.H. free appropriate public education by failing to perform a speech and language evaluation since June 16, 2004, failing to provide R.H. with necessary specialized instruction and related services since June 16, 2004, and failing to provide R.H. with an appropriate school placement since June 16, 2004;

ORDERED, that DCPS shall fund R.H.'s placement at Rock Creek Academy, with transportation; and further

ORDERED, that DCPS shall convene a multidisciplinary team meeting within thirty days of R.H.'s enrollment at Rock Creek Academy, and at that meeting shall review all current evaluations, revise R.H.'s IEP as appropriate, and develop a compensatory education plan to compensate R.H. for the violations and denials identified in this Order.

1

_____
Judge Rosemary M. Collyer
United States District Court Judge